UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RELEVENT SPORTS LLC

                         Plaintiff,

~ against ~

CARMELO STILLITANO,

                         Defendant.

1:22-CV-2917

**AFFIDAVIT OF
CARMELO STILLITANO**

STATE OF NEW YORK   )
                               ss.:
COUNTY OF NEW YORK )

      CARMELO STILLITANO, being duly sworn, deposes and says:

      1.    I am the Defendant herein. I submit this affidavit in opposition to Plaintiff's application for a preliminary injunction and to immediately dissolve and vacate the temporary restraining order that this Court improvidently entered on April 8, 2022 ("TRO").

      2.    I am confident that if I had been afforded the opportunity to be heard in opposition, this Court would not have granted the TRO due to the numerous inaccuracies and hotly disputed issues of fact contained in the moving papers. These factors, coupled with the legal arguments set forth in the accompanying memorandum of law, warrant the denial of the preliminary injunction and the immediate vacatur of the TRO.

      3.    Most notably, I respectfully submit the issue is not whether I violated the restrictive covenant, but whether it is enforceable at all. Since Plaintiff, Relevent Sports LLC ("Relevent" or "Company"), has indisputably breached my employment agreement by failing and refusing to pay me nearly $1,000,000 which I am owed under the contract, it cannot enforce this clause. On March 24, 2022, I commenced an arbitration proceeding before the American Arbitration Association

1

948505.v2

seeking damages for Relevent's breach of the Employment Agreement. Because the papers which led to the TRO clearly deliberately omitted to bring this to the Court's attention, I have attached hereto **(Exhibit A)** a true and correct copy of the Arbitration Demand.

4. After Relevent terminated my employment nearly a year ago, the Company and I continued to remain on very good terms because of our mutual interests, despite their refusal to pay me the wages that I had earned. Not only did the Company wish me well in my new endeavors, they in fact assisted me in pursuing the very opportunities about which they now complain. As I will explain in detail below, it was only after Relevent forged a relationship with the Union of European Football Associations ("UEFA") in early 2022 that its position regarding me changed. UEFA has different motivations with respect to certain of the parties I deal with, and as such, I became a very small fish caught between these whales.

## BACKGROUND

5. In 2012 – having spent the preceding two decades in the field of international soccer – I co-founded Relevent (a soccer events and media company) with billionaire Stephen M. Ross, and Matt Higgins. Ross is the owner of the Miami Dolphins and the Related Companies (among other businesses in Ross's expansive empire). Higgins is Co-Founder of RSE Ventures, a private investment firm focusing on sports, media, entertainment, and marketing. Relevent's day-to-day operations are handled by its president, Daniel Sillman (who is Ross's son-in-law).

6. During my time at Relevent, the Company became the preeminent soccer events entity in the United States. Under my direction and through my relationships, Relevent also expanded into the sports marketing and media space. For almost a decade, I traveled the world introducing Ross, Sillman, and Higgins to key players in the international soccer world to which

they would otherwise not have access. I also provided Relevent with the benefit of the wealth of experience I had in organizing soccer matches and events worldwide.

7. In July 2018, Relevent and I entered into an Employment Agreement (the "Contract") that governed our relationship **(Exhibit B)**.

8. The Contract provided that I would be employed by Relevent as its Executive Chairman. Pursuant to Section 3 of the Contract, I was to be paid a Base Salary of $625,000 per year. Recognizing the value I brought to the Company, I was also granted a 10% equity interest in Relevent, which was subsequently reduced to 7%.

9. At all times during my employment, I faithfully performed my duties pursuant to the Contract. At no time did Relevent, Ross, Sillman, Higgins, or anyone else ever convey any concern whatsoever about my work. In fact, I received significant annual performance bonuses in each year in which the Company could afford to pay same.

10. The Contract (§3) provided that my Base Salary would be reviewed annually, and that the Company's designee may *increase* the Base Salary based upon my performance and other factors deemed appropriate. In accordance with this provision, and owing to my exemplary performance, the Company increased my base salary to $650,000 in or about June 2019. The Contract did not contain any provision permitting Relevent to reduce my base salary.[1]

---

[1] The Contract (§19) includes an integration clause, which provides that "the Agreement, the Covenants Agreement and the Note contain the ***entire understanding*** of the parties regarding the terms and conditions of Executive's employment and none of this Agreement, the Covenants Agreement or the Note may be modified ***except by a signed document approved and executed by the Company and Executive***." No writing was ever executed purporting to alter the Contract in any way.

948505.v2

**RELEVENT'S UNILATERAL SALARY DEFERRAL**

11.     On or about April 17, 2020, following the onset of the COVID-19 emergency, the Company breached the Contract by unilaterally advising me that, effective May 1, 2020, it would temporarily reduce my Base Salary by approximately 70%, to approximately $200,000 *per annum*.

12.     I immediately had numerous discussions about this issue with Company representatives. I first went to Sillman to voice my objections on that very day, April 17, 2020. During that conversation, Sillman assured me that this was not a permanent reduction in compensation, but rather a temporary Covid-related "deferral," similar to the action many businesses had taken during that difficult time. To afford me further assurances, Sillman urged me to speak with Diana Nelson, a C-Level executive in charge of Relevent's human resources.

13.     Nelson acknowledged and confirmed what Sillman had told me: that this reduction was a short term "deferral" to help alleviate COVID-related cash flow issues. She reassured me that the substantial shortfall in my Base Salary would be repaid to me in the near future. She even advised me that Relevent had consulted with counsel who had unequivocally determined that the Company had the obligation to pay me the Base Salary shortfall, and that the Company would do so.

14.     When Relevent took this action, I spoke with many friends, advisors, and colleagues both within and outside our industry. I immediately understood that because of the Pandemic, Relevent's decision to defer compensation was a standard practice to address these short-term cash-flow concerns.

15.     Thereafter, in an abundance of caution, I provided formal notice to Relevent on or about May 29, 2020 of Good Reason (as defined in Section 11(e)(iii) of the Contract). The Notice indicated that Relevent had "reduced my Base Salary below $625,000 without my consent" and

advised that the "Company's reduction of [my] Base Salary as set forth in the Agreement" was a breach. A copy of my June 2, 2020 Notice is attached as **Exhibit C**.

16. Concurrently with that I also sent a letter to the Company, which stated that the "notice [of breach] provided was merely done to preserve my rights under the [Contract]" and that it was "my intention to resolve these issues with the Company… [t]o that end, it is my hope that we can have a meaningful conversation to find a resolution." A true and correct copy of the Cover Letter is attached as **Exhibit D**.

17. In response to these letters, I again received numerous assurances from Nelson that the reduction was a temporary deferral, which would be repaid.

18. Because the deferral of salary had become a generally accepted practice in businesses during that extraordinary time and I enjoyed working with Relevent, I agreed to this deferral but never a reduction. Thus, in reliance on the Company's promises that this was a Covid-related temporary deferral (and the fact that my Contract had never been amended in writing), I continued to perform my duties as Executive Chairman.

19. I persisted in voicing my objections to the "deferral" of the vast majority of my compensation. I repeatedly brought this up with Nelson, inquiring as to when the back pay would be paid. She repeatedly assured me that I would be paid the shortfall once Relevent's Covid-related cash flow issues mitigated.

**RELEVENT TERMINATES MY EMPLOYMENT**

20. By 2021, Relevent's cash flow challenges persisted, largely due to Covid limitations. Because the Company had already exhausted my contacts and relationships in the international soccer community over the preceding 9 years, Relevent apparently determined that

948505.v2

it did not wish to pay even the undeferred portion of my compensation (let alone the back-pay that I was owed).

21. As such, Relevent terminated my employment without cause on May 7, 2021. Relevent's claim in its moving papers that I asked to be fired is ridiculous, and simply untrue. (Compl. [Dkt. #1] ¶ 32). At the time of my termination, Relevent owed me approximately $463,541 in Base Salary. The Contract provides (§11(b)), that upon my termination, I am entitled to receive any Base Salary that had been earned (e.g., the deferred amount), but unpaid up to the date of termination. That sum has not been paid.

22. In addition, upon my termination, I was entitled to receive Severance Payments, which are defined as Base Salary for a period of one year from the date of termination. Since the Company terminated me without cause on May 7, 2021, severance payments at the *per annum* rate of $650,000 were to continue until May 7, 2022 (*see* §11(c)(i)). Those amounts were to be paid over the course of *one* year pursuant to the Contract. ("In the event that Executive's employment with the Company is terminated by the Company without Cause…the Company shall provide Executive with continued Base Salary payments, less applicable taxes and withholdings, paid in equal installments in accordance with the normal payroll practices of the Company over a period following the date of Executive's termination of employment equal to twelve (12) months…")

23. Relevent again breached the Contract by unilaterally electing to pay me the $650,000 in Severance Payments over the course of *two* years (as opposed to one year as required in the Contract). A copy of a pay stub indicating my Severance Wages are attached as **Exhibit E**.[2]

---

[2] While the "Pay Rate" continues the fiction that my salary was reduced to $200,000, the actual "Separation Pay Recurring" shows that I was paid bi-monthly gross wages of $13,541.67, which comes out to $325,000 per year, and $650,000 over two years, confirming Relevent's breach.

24. The fact that the Severance Payments were acknowledged by Relevent to be $650,000 is an undeniable admission that my pre-termination compensation was $650,000 *per annum,* and not the $200,000 that Relevent claims.

25. In January 2022, Relevent ceased payment of the severance payments altogether, constituting yet another breach.

26. As of today, Relevent owes me approximately $1,000,000 in Base Salary and Severance Payments to which I am entitled under the Contract. Accordingly, I commenced the Arbitration (the contractually agreed upon dispute resolution mechanism (§24)) on March 24, seeking repayment of the amounts owed to me, a judicial declaration that the restrictive covenant is unenforceable, plus applicable interest and other damages. **(Exhibit A)**.

## POST-TERMINATION ACTIVITIES

27. Unlike Ross (or Relevent's other principals), I am not a wealthy man. I need to work to earn a living and provide for my family. When Relevent terminated me without cause in May 2021 and failed to pay me what I was owed, I needed to earn money. I was advised that Relevent's breach of the Contract relieved me of any obligations under the purported restrictive covenant. This made sense to me, because my non-participation in the world of soccer came at a price which Relevent had refused to pay.

28. As such, I activated CWS Events Corp. d/b/a ChampionsWorld ("CW"), a New Jersey corporation which I owned and had formed long before my affiliation with Relevent. I did not then have a clear picture of CW's business' goals, other than to generally promote entertainment events worldwide, seeking to leverage my decades of relationships for commercial opportunity.

948505.v2

29. In late-summer 2021, CW was approached by Lega Serie A (a professional league for soccer clubs in Italy). Serie A sought to have CW act as its agent in the United States to expand its American presence. This was a very promising opportunity for me, given the significant financial harm that I had suffered by virtue of Relevent's refusal to pay me what I had earned. My consulting deal with Serie A was consummated in December 2021, although the relationship was reported in the media as early as November 2021. Copies of certain media reports describing my deal with Serie A are attached as **Exhibit F**.

30. Thus, by that time Relevent knew that I was actively participating in conduct which arguably was in violation of the restrictive covenant (if it were enforceable). Yet, the Company never objected or took action to enjoin it.

31. Not only did Relevent fail to object, it actually took steps to assist me in advancing the Serie A deal's publicity. On December 1, 2021, Sillman wrote to me *via* text message that he had been contacted by Bob Williams, an influential journalist with SportBusiness, seeking comment on the deal. Williams was apparently under the misapprehension that Serie A had contracted with Relevent. Sillman wrote to me that Williams "thought Relevent was doing serie a deal." Sillman told the reporter that "we are not but to call [Stillitano]." I thanked Sillman for the referral, to which he responded "yeah I didn't know what u wanted me to say so I just said I don't know the details but that he should talk to you and that Relevent is not involved. Hope that's good." A screenshot of this text exchange with Sillman is attached hereto as **Exhibit G.**

32. A week later, on December 6, Sillman asked me to set up a time to get together. Being completely open with him, I suggested the following week, stating that "I just got called from Serie A, I need to meet this week in Milano before they shut down the world again." Sillman

8

responded: "sounds good. Safe travels!"  A screenshot of this text exchange with Sillman is attached hereto as **Exhibit H.**

33.     When I returned from Milan, Sillman reached out again on December 13, 2021. The purpose of this text was not to object or raise any concerns about my activities, but instead to invite me to the Relevent holiday party the next day.  I responded that I "[d]efinitely will stop by" to which Sillman responded "Great. Thanks." *Id*.  At the holiday party, Sillman welcomed me with open arms, and we openly discussed in detail my work with Serie A.  After the party, Sillman wrote to me "thank you so much for coming…***love you!***" *Id*.  Thereafter, Sillman even explored ways in which Relevent might work together to support my venture with Serie A to our mutual benefit.

34.     Thus, it is undeniable that as of December 2021, Relevent was actually supporting me in working with Serie A as well as my other opportunities.  Thus, Relevent's current complaint and indignation about my so-called wrongful conduct ring hollow.

35.     CW's activities in 2021 also included negotiating with and soliciting certain international teams (including Real Madrid, Barcelona and Juventus) to participate in a summer 2022 soccer tournament in the United States.  Although no deals were consummated, these efforts were widely known in both the global soccer community and the North American sports business community in the fall of 2021.  I am certain that Relevent was aware of these efforts.  Once again, despite this, at no point in 2021 did Relevent ever complain about my activities or those of CW, presumably because: (i) Relevent and I had a good relationship and the Company was anxious to see me succeed; (ii) Relevent knew that it had not paid me what was owed under my contract; and (iii) by that time Relevent was not interested in pursuing soccer games in summer 2022.[3]

---

[3] Relevent attempted, unsuccessfully, to organize and solicit a summer tournament for 2022.  Specifically, Relevent approached four teams for this potential venture: Manchester City, Paris Saint-Germain, Chelsea FC, and Manchester-

948505.v2

**UEFA**

36. In January 2022, Relevent – leveraging my contacts and relationships that I had introduced over the years – won a hotly contested bid to become UEFA's agent in connection with the sale of UEFA Champions League ("UCL") media rights in the United States. This was a major commercial development for Relevent. In American football terms, this would be analogous to having the exclusive license to sell media rights to NFL games. Because Relevent and UEFA are now united in a deeply significant commercial relationship, Relevent is highly sensitive to the desires of its partner.

37. A brief recital of what is now taking place in the international soccer world is required. In 2021, the most significant European soccer teams had announced a joint venture under the name European Super League Company ("ESLC") to form what was known as the "Super League." The Super League would be an alternative to the UCL for European soccer clubs. If successful, this would threaten the market share of UEFA in Europe (and, potentially, its entire business) and certainly would substantially diminish its significance. As such, UEFA mounted an aggressive counterattack against the Super League and its participants, ruthlessly disparaging any teams that were involved.

38. Ultimately, UEFA was successful in brandishing its vast influence to strong-arm all but three teams to announce their intention to drop out of the Super League. The teams which defied UEFA by continued support of the Super League project are Barcelona, Real Madrid, and

United. None of those teams were available, as two had already committed to summer games in Asia, and the remaining two had already committed to another promoter in North America. Relevent could not contract with clubs like Barcelona, Real Madrid or Juventus because Relevent had already entered an exclusive media rights contract with UEFA for the United States (*see* below), and these teams are active members of European Super League Company, the company that announced the Super League project last year and is engaged in ongoing litigation with UEFA in the European Union over antitrust concerns. Thus, by early 2022 Relevent had given up on the notion of organizing and promoting a 2022 summer tournament.

948505.v2

Juventus. Coincidentally, it so happens that these are among the football clubs with whom I was dealing in discussions toward a possible North American tournament in Summer 2022.

39. UEFA remains deeply scarred by the 2021 Super League efforts, and in fact seeks to extract revenge in any way possible against these three teams. That includes preventing them from playing games, and achieving their business objectives. For instance, UEFA even opened disciplinary proceedings against the three clubs last summer and announced its intention to take them out of the current UCL edition (the equivalent of removing the Kansas City Chiefs from the NFL playoffs). UEFA was, however, forced to stop such disciplinary proceedings against the three clubs by the Spanish Courts, which granted an injunction against UEFA to allow the Super League project and its members to continue developing such initiative, at least while the case is being handled, without being exposed to UEFA's sanctions and potential actions. When it became widely known that these three clubs were considering whether to participate in a North American summer 2022 tournament, I believe that UEFA leveraged its influence over Relevent to prevent that from happening. Relevent had no interest in a summer tournament in 2022, and it raised absolutely no objection to CW's activities throughout 2021.

40. Recognizing UEFA's stature in the international soccer community, and the animosity it harbored toward Barcelona, Real Madrid, and Juventus, I decided to contact UEFA to explain the opportunities I was exploring. On January 29, 2022, I wrote to UEFA's president Aleksander Ceferin, one of the most influential individuals in soccer, and who I consider a friend. I informed Ceferin that "I am trying to work on several different projects to support my family and one of the opportunities is to put on matches in the USA. Several teams have come to me looking for summer preseason matches in the USA including the three that have caused issues with UEFA." A copy of this text exchange is attached as **Exhibit I.**

41. Just hours later, Ceferin responded as follows: "Hi Charlie, as you know I have heard about your 'business' with the three clubs. Those clubs didn't 'cause issues with UEFA.' They tried to destroy UEFA, football an[d] me personally. It's a shame that you don't understand it. ***The fact that you work with them means that me, UEFA or anyone I can have influence on will not have any business or private relation with you*** until you're on the other side." **Exhibit I.** Upon receiving this threatening message, it became clear that Ceferin and UEFA – and by extension their new partner, Relevent – were declaring war on me for even considering a potential affiliation with the three teams.

42. And I was right. Just *three days after* Ceferin's message, I received Relevent's February 1, 2022 Cease & Desist Letter (Dkt. #1-7). Following the February 1, 2022 Cease & Desist Letter, my counsel explained to Relevent's representatives that any purported restrictive covenant was rendered null and void by Relevent's breaches. Obviously, I was shocked to receive this since just a few weeks earlier I was showered with messages of "love you" from Sillman, and assistance with the very same actions now complained of.

43. To preserve my longstanding relationships and to make peace, I elected to enter into settlement discussions. These talks ended in an agreement whereby I would agree to abide by the claimed restrictive covenant for a brief period of three months through May 7, 2022 *in exchange for* a substantial payment toward the amounts that were owed under the Contract as well as other consideration. I believed we had reached an agreement in principle.

44. However, when Relevent's attorneys circulated a near-final draft of the settlement agreement, they suddenly included a provision (which had not been agreed upon or even discussed) whereby I would be compelled to forfeit my 7% equity interest in Relevent. I had earned that 7% equity position through bringing my contacts and relationships to Relevent, which dramatically

948505.v2

enhanced the value of the Company. I was not about to forfeit this equity which I believe has significant value, and in the future will have even greater value. Since I believed this equity to have significant future value based in large part on the UEFA deal, I refused to agree to this point. I was entitled to retain this equity even if I was terminated. This unwarranted demand was based on nothing more than Relevent's overwhelming greed and belief they could exploit my need for the wages I was owed.

45. Relevent's avarice caused the settlement efforts to collapse. Once it became clear that Relevent would not pay me the wages that I had earned, I filed my Demand for Arbitration before AAA on March 24, 2022 **(Exhibit A)**, and proceeded with my efforts to earn a living. Just over two weeks later, Relevent filed this retaliatory action.[4]

46. Now, by virtue of this Court's April 8, 2022 *ex parte* Order, I am not able to earn a living, nor have I been paid the roughly $1,000,000 that Relevent owes me. My entire world is soccer. Since Relevent improperly cut off my severance payments at the end of January 2022, the most I have been able to earn is $375 per show for various radio talk show appearances. I have no other income, and in fact I have had to take out loans in order to live.

47. Any suggestion that I have disclosed Relevent's confidential information is 100% false. I do not possess, nor have I used any confidential proprietary information belonging to Relevent.

---

[4] In connection with this action, Relevent served numerous discovery demands on Monday April 11, 2022 (**Exhibit J**). I represent to the Court that I have undertaken appropriate steps to preserve all potentially relevant materials, electronic or otherwise, and will exchange all relevant documents within the confines of the currently pending arbitration.

948505.v2

WHEREFORE, it is respectfully prayed that the within requested relief be denied in its entirety, and that the TRO be immediately dissolved and vacated.

_____
Carmelo Stillitano

Sworn to before me this
14 day of April, 2022

_____
Notary Public

**WILLIAM HYNES MACK**
**NOTARY PUBLIC-STATE OF NEW YORK**
No. 02MA6280153
Qualified in New York County
My Commission Expires April 22, 2023

14

948505.v2