# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "**Agreement**") dated as of June 21, 2018 by and between Relevent Sports, LLC, a Delaware limited liability company (the "**Company**"), and Charlie Stillitano ("**Executive**").

WHEREAS, the Company wishes to employ Executive on the terms and conditions set forth herein and Executive wishes to be so employed, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, and for other good and valuable consideration, it is hereby covenanted and agreed by Executive and the Company as follows:

1. *Term.* The term of this Agreement shall commence on June 21, 2018 and shall end when Executive's employment under this Agreement is terminated pursuant to Section 11 of this Agreement ("**Term**").

2. *Title, Function and Duties.* Executive shall be employed by the Company as Executive Chairman, with such responsibilities, duties, and authority as may be assigned from time to time by the controlling member of the Company (RSE Ventures, LLC) or its designee (the "**Member**") and shall have the title of Executive Chairman. Executive, in carrying out his responsibilities, duties and authority under this Agreement, shall report directly to the Member. During the Term, Executive shall devote substantially all of his business time and attention to the business and affairs of the Company, and shall use his best efforts, skills, and abilities to promote its interests. Executive may engage in charitable, civic or community activities and may manage Executive's passive personal investments; *provided* that such activities or services do not materially interfere with Executive's duties hereunder or violate the terms of this Agreement or any other agreement to which Executive and the Company or its affiliates is a party; *provided, further*, that any such activities or services shall be subject to the prior written approval of the Member (which approval shall not be unreasonably withheld). For purposes of this Agreement, the activities set forth on Exhibit A, attached hereto, have been pre-approved by the Member, subject to the limitations set forth in the immediately preceding sentence. As set forth in Section 15, Executive agrees to observe and comply with the rules and policies of the Company as adopted from time to time by the Company.

3. *Base Salary.* During the Term, Executive's salary shall be paid at the rate of Six Hundred and Twenty Five Thousand Dollars ($625,000) per annum (less applicable deductions and withholdings), payable in accordance with the Company's regular payroll practices (the "**Base Salary**"). Each year, the Member shall review the Base Salary based upon performance and other factors deemed appropriate by the Member and may make such increases as it deems appropriate.

4. *Annual Bonus.*

   (a) At the Company's option, Executive may be eligible to receive a discretionary bonus, payable in accordance with Company policy, as may be amended from time to time (the "**Annual Bonus**"). The amount of this discretionary Annual Bonus shall be targeted at thirty percent (30%) of Executive's Base Salary. The actual amount of this discretionary Annual Bonus, if any, shall be determined by the Member in its sole discretion using any criteria that it chooses to employ (including, without limitation, the level of Executive's performance and the Company's performance).

   (b) Any discretionary Annual Bonus shall be paid, in cash, no later than March 31 following the end of the applicable fiscal year and shall be paid less applicable deductions and withholdings.

(c)     In order to be eligible for a discretionary Annual Bonus, if any, Executive must be in "active working status" at the time of the bonus payment. For purposes of this Agreement, "active working status" means that Executive has not resigned (or given notice of Executive's resignation) or been terminated (or been given notice of Executive's termination).

5.     *Management Equity.* Executive may receive a phantom equity award in the Company, as determined by the Member, which award (if any) shall be subject to the terms and conditions set forth in the Relevent Sports, LLC Phantom Unit Plan adopted by the Company (the "**Plan**") and a Phantom Unit Award Agreement to be agreed by the parties.

6.     *Benefits.* Executive shall be entitled to participate in and receive benefits under the Company's employee benefits plans on the same terms and conditions as the Company's other senior executive officers, including without limitation, medical and dental insurance, disability insurance, life insurance and 401(k) retirement benefits.

7.     *Time Off.* Executive shall be entitled to take vacation in accordance with the Company's vacation policy in effect from time to time.

8.     *Expenses.* The Company shall reimburse Executive for reasonable business-related expenses incurred by Executive in connection with the performance of Executive's duties under this Agreement during Executive's employment, subject to Company policies relating to business-related expenses in effect from time to time.

9.     *Promissory Note.* With respect to that certain Promissory Note by and between the Company and Executive dated June 21, 2018, as amended (the "**Note**"), upon the occurrence of any of the following events, the Company shall immediately forgive the entire unpaid principal and accrued interest payable under the Note on June 21, 2028 (the "**Outside Date**"), subject to Executive's continuous compliance with the Covenants Agreement (as defined in Section 13) through the Outside Date:

(a)     if (i) Executive remains continuously employed by the Company until the Outside Date, and (ii) either (A) a Liquidity Event (as defined in the Note), has not occurred before the Outside Date, or (B) a Liquidity Event has occurred before the Outside Date, but the net-after-tax amount (as defined in the Note) paid in respect of any phantom units issued to Executive under the Plan are not sufficient to repay the entire unpaid principal and accrued interest then payable under the Note pursuant to Section 2.3 of the Note; or

(b)     if (i) Executive's employment with the Company has been terminated (A) by the Company without Cause (as defined in Section 11(e)), (B) by Executive with Good Reason (as defined in Section 11(e)), (C) by the Company in the event of Executive's Disability (as defined in Section 11(e)), or (D) due to Executive's death, and (ii) a Liquidity Event has not occurred before the Outside Date.

10.     *Prior Employment.* The Executive hereby represents to the Company: (a) that the execution and delivery of this Agreement by Executive and the Company and the performance by Executive of Executive's duties hereunder shall not constitute a breach of, or otherwise contravene, the terms of any other agreement or policy to which Executive is a party or otherwise bound; (b) that Executive has no information (including, without limitation, confidential information and trade secrets) relating to any other person or entity which would prevent, or be violated by, Executive entering into this Agreement or carrying out Executive's duties hereunder; and (c) that Executive is not bound by any confidentiality, trade secret or similar agreement with any other person or entity which would prevent, or be violated by, Executive (i) entering into this Agreement or (ii) carrying out Executive's duties hereunder. Executive understands that his employment and Executive's continued employment at the Company are contingent on the accuracy of this representation.

11. *Termination of Employment.*

(a) The Executive's employment with the Company, and the Term hereof, may be terminated at any time (i) by the Company with or without Cause, (ii) by the Company in the event of Executive's Disability, (iii) by Executive for any reason or (iv) due to Executive's death. Any termination of Executive's employment under this Agreement (other than because of Executive's death) shall be communicated by written notice of termination from the terminating party to the other party, which termination shall be effective (x) no less than thirty (30) days following delivery of such notice in the event of a termination by the Company without Cause or by Executive for any reason or (y) immediately in the event of a termination by the Company for Cause. The notice of termination shall indicate the specific provision(s) of this Agreement relied upon in effecting the termination.

(b) In the event Executive's employment terminates for any reason, Executive shall receive any Base Salary that has been earned but unpaid up to the date of Executive's resignation or termination. All employment perquisites, entitlements and benefits shall immediately cease, and the Company shall have no further obligation to Executive, except as may be provided under the applicable benefits plans or the express terms of this Agreement or as otherwise required by law. Executive shall not be entitled to receive any bonus whatsoever, including any anticipated discretionary Annual Bonus referred to in this Agreement (other than any discretionary Annual Bonus already paid to Executive as of the date of Executive's resignation or termination).

(c) In the event that Executive's employment with the Company is terminated by the Company without Cause and not due to Executive's Disability, or Executive terminates employment hereunder for Good Reason, subject to Executive's executing within forty-five (45) days following such termination of employment (or such shorter period provided in the release), and not subsequently revoking, a general release, in form acceptable to the Company, of all claims arising under this Agreement, any phantom units that may be granted to the Executive under the Plan or otherwise related to Executive's employment by the Company and subject to Executive abiding in all material respects by his obligations under the Covenants Agreement, the Company shall:

(i) provide Executive with continued Base Salary payments, less applicable taxes and withholdings, paid in equal installments in accordance with the normal payroll practices of the Company (the "**Salary Continuation Payments**") over a period following the date of Executive's termination of employment equal to twelve (12) months (the "**Salary Continuation Period**"); and

(ii) subject to Executive's eligibility for and timely election of continuation coverage under the Company's group health plan pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("**COBRA**") for Executive and his eligible dependents, reimburse Executive for the cost of the monthly COBRA premiums that exceeds the monthly premium charged to the Company's active employees for the same coverage during the Salary Continuation Period or, if earlier, until such time as Executive obtains such coverage from a new employer or Executive's COBRA coverage otherwise terminates, and together with the Salary Continuation Payments, the "**Severance Payments**"). Notwithstanding the foregoing, the Company shall not be obligated to provide the COBRA subsidy if it would cause the Company to incur excise taxes under Section 4980D of the Internal Revenue Code or otherwise violate the nondiscrimination requirements of the Patient Protection and Affordable Care Act, as amended and the Health Care Reconciliation Act of 2010, as amended.

(d) Notwithstanding the foregoing, (i) any portion of the Severance Payments that would otherwise have been paid to Executive or reimbursed before the first normal payroll payment date

falling on or after the sixtieth (60th) day following the date of Executive's termination of employment (the "**First Payment Date**") shall be made on the First Payment Date, (ii) if Executive fails to comply with Executive's obligations under the Covenants Agreement, the Company shall no longer be required to provide the Severance Payments.

(e) For purposes of this Agreement, the following terms shall have the meanings set forth below.

(i) "**Cause**" shall mean any of the following events: (A) Executive's willful failure to materially perform the duties of Executive for the Company; (B) Executive ceases to devote substantially all of his professional time to the Company; (C) Executive's failure to carry out, or comply with, in any material respect, any lawful and reasonable directive of the Member that is consistent with the terms of this Agreement; (D) Executive's indictment, conviction, plea of no contest or entering into any plea agreement to any felony or any crime involving moral turpitude or dishonesty, fraud, theft, misappropriation or embezzlement; (E) Executive's unlawful use (including being under the influence) or possession of illegal drugs on the Company's premises or while performing Executive's duties and responsibilities, or Executive's habitual abuse of alcohol while performing Executive's duties and responsibilities under this Agreement; (F) Executive's commission at any time of any act of willful misconduct, gross negligence, act of dishonesty, fraud, theft, misappropriation, embezzlement, violence or threat of violence, in each case, (x) against the Company or any of its affiliates or personnel (or any predecessor thereto or successor thereof) or (y) that has a detrimental impact on the Company or any of its affiliates; or (G) Executive's material breach of any of the terms of this Agreement or the Covenants Agreement, or the material violation any written policy of the Company or one of its subsidiaries; provided that, with respect to clauses (A), (B), (C), (E) or (G) and if the event, act or omission is curable as determined by the Member, the Company provides written notice to Executive specifying in reasonable detail such event, act or omission that constitutes Cause and Executive has failed to cure within thirty (30) days after such notice.

(ii) "**Disability**" shall mean that Executive is: (A) unable to engage in the essential duties of his position by reason of any medically determinable physical or mental impairment, as determined by a physician selected by the Company or its insurer, for a continuous period of not less than one-hundred twenty (120) days or one-hundred eighty days, whether or not consecutive, during any three hundred sixty five (365) day period; (B) is receiving benefits under the Company's long-term disability insurance plan, or (C) has been determined to be disabled by the Social Security Administration.

(iii) "**Good Reason**" shall mean, at any time during the Term of this Agreement, the occurrence of any one (1) of the following events without Executive's prior written consent: (A) any material diminution in Executive's duties or responsibilities without his prior written consent; (B) the Company's reduction of Executive's Base Salary; (C) the Company's material breach of this Agreement; or (D) the Company's relocation of Executive's principal place of employment by more than seventy-five (75) miles from its current location. "Good Reason" shall not exist until and unless Executive has given the Company notice of the applicable event within ninety (90) days of the date Executive has actual knowledge of such event. Such notice shall specifically delineate such claimed breach and shall inform the Company that the Company is required to cure such breach (if curable) within thirty (30) days (the "**Cure Period**"). If such breach is not so cured (or is not curable) or disputed in writing by the

4

Company, Executive may resign for Good Reason within a reasonable time after the end of the Cure Period not to exceed three (3) months. If such breach is cured within the Cure Period, Good Reason shall not exist hereunder.

12. *Removal from Boards and Positions.* If Executive's employment is terminated for any reason, Executive shall be deemed to resign (a) if a director or manager, from the board of directors or board of managers of the Company or any subsidiary, affiliate, investment fund of, or limited partnership sponsored by, the Company and (b) from any position with the Company or any subsidiary, affiliate or investment fund of, or limited partnership or employee benefit plan sponsored by, the Company, including as an officer, fiduciary or trustee of the Company or any of its subsidiaries, affiliates, investment funds or limited partnerships. Executive agrees that this Agreement shall serve as written notice of resignation in this circumstance, and Executive agrees to execute any documents evidencing such resignation as that Company may reasonably request.

13. *Restrictive Covenants.* The restrictive covenants applicable to Executive, which Executive agrees to comply with fully and which Executive acknowledges shall be strictly enforced by the Company are set forth in the Employee Covenants Agreement (the "**Covenants Agreement**"), dated as of the date hereof, entered into by Executive and the Company.

14. *Confidentiality of Agreement.*

(a) Executive agrees that the terms of Executive's employment with the Company are confidential. Accordingly, in consideration of Executive's employment and/or continued employment, Executive also agrees that beginning on the date that Executive executes this Agreement and continuing through two (2) years after the last date of Executive's employment, Executive shall not disclose the terms of this Agreement to anyone except Executive's immediate family, tax advisors and legal counsel, except as otherwise required by law or in a legal proceeding to enforce the terms of this Agreement. If Executive receives a subpoena or request for disclosure of this Agreement and/or the terms of this Agreement, Executive agrees to provide prompt written notice to the Company prior to responding to such subpoena or request. Executive further agrees to reasonably cooperate with the Company in taking appropriate steps to maintain the confidentiality of the terms of this Agreement.

(b) Notwithstanding the foregoing, Executive may disclose Executive's compensation and the Covenants Agreement and relevant provisions regarding Executive's ongoing obligations to the Company, including with respect to Executive's obligations regarding the Company's Confidential Information (as defined in the Covenants Agreement), proprietary information and trade secrets, to any prospective and future employers.

15. *Compliance with Policies and Procedures.* Executive agrees to be bound by and to comply fully with all Company policies and procedures for employees including, but not limited to, any memoranda and communications of Member or the Company applicable to Executive pertaining to policies, procedures, rules and regulations, as currently in effect and as may be created and/or amended from time to time. In addition, Executive shall comply in all material respects with all laws, rules and regulations that are generally applicable to the Company.

16. *Cooperation and Assistance.* Executive agrees to cooperate fully, subject to reimbursement by the Company of reasonable out-of-pocket costs and expenses, with the Company or any of its affiliates and their counsel, with respect to any matter (including any litigation, investigation or government proceeding) that relates to matters with which Executive was involved or about which Executive had knowledge during Executive's employment with the Company.

17. *Acknowledgment.* Executive represents and warrants that Executive has read this Agreement, has consulted with Executive's own advisors (if Executive so chooses) regarding the terms of this Agreement and is fully aware of its content and legal effect.

18. *Notices.* All notices required or permitted under this Agreement shall be in writing and shall be sufficiently given if personally delivered or sent by certificated mail, postage prepaid, with return receipt requested or sent by reputable overnight courier addressed as follows:

If to the Company:

Relevent Sports, LLC
c/o RSE Ventures, LLC
423 West 55th Street, 11th Floor
New York, NY 10019
Attention: Abraham Rondina, Esq.

With copies (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, New York 10166
Attention: Stefan G. dePozsgay, Esq.

If to Executive:

At the most recent address provided by Executive to the Company for human resource purposes.

19. *Modification; Entire Agreement.*

(a) With the exception of any trade secret acknowledgment or similar agreement signed by Executive during the course of Executive's employment, this Agreement, the Covenants Agreement and the Note contain the entire understanding of the parties regarding the terms and conditions of Executive's employment and none of this Agreement, the Covenants Agreement or the Note may be modified except by a signed document approved and executed by the Company and Executive.

(b) Executive acknowledges that, in executing this Agreement, Executive has not relied on any oral or written representations or understandings other than those explicitly contained herein.

(c) This Agreement, the Covenants Agreement and the Note supersede any and all oral or written understandings regarding the terms and conditions of Executive's employment with the Company or any of its affiliates.

20. *Waiver.* The waiver by either party hereto of a breach of any provision of this Agreement shall not be construed as a waiver of any subsequent breach. The failure of either party to insist on strict adherence to any provision of this Agreement on one or more occasion(s) shall not be considered a waiver or deprive that party of the right thereafter to insist on strict adherence to that provision or any other provision of this Agreement.

21. *Assignment.*

(a) This Agreement shall be binding on and shall inure to the benefit of Executive and Executive's heirs, assigns, executors, administrators and other legal representatives and shall be binding on and shall inure to the benefit of the Company and its affiliates, successors and assigns, including, without limitation, any corporation or other entity into which the Company is merged. This

Agreement is not assignable by Executive without the Company's written consent, and any attempt to do so shall be void. The Company reserves the right to assign this Agreement to its affiliates, successors and assigns.

(b) Furthermore, Executive agrees that Executive's obligations under this Agreement apply equally to any position that Executive may hold with any affiliate(s) of the Company, including any investment funds or limited partnerships sponsored by the Company or any of its affiliates.

22. *Counterparts.* This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

23. *Severability.* It is the intent and understanding of each party hereto that if any term, restriction, covenant or promise is found to be unenforceable by a court or tribunal of competent jurisdiction, then such term, restriction, covenant or promise shall be deemed modified to the minimal extent necessary to make it enforceable. If any provision of this Agreement is declared void or unenforceable by a court or tribunal of competent jurisdiction, all other provisions shall nonetheless remain in full force and effect.

24. *Arbitration.*

(a) Except for any matters relating to the Note, the Company obtaining equitable relief for a breach of the Covenants Agreement, and Executive's right to claim workers compensation or unemployment insurance benefits, the Company and Executive agree to submit all claims that either of them may have against the other relating to this Agreement, the Covenants Agreement, or Executive's employment or termination of employment with the Company, including without limitation any claims that may be brought on a class or collective basis, exclusively to binding arbitration under the National Rules for the Resolution of Employment Disputes of the American Arbitration Association ("**AAA**").

(b) Either party hereto may initiate arbitration proceedings by filing a demand for arbitration at the New York, New York office of the AAA. The arbitrator's fee and any fees and costs owed to the AAA shall be paid by the Company. Executive shall be entirely responsible for Executive's own attorneys' fees and disbursements. If the arbitrator determines that Executive has acted in bad faith or has asserted claims that, if asserted in a lawsuit in federal court, would justify an award of sanctions under Rule 11 of the Federal Rules of Civil Procedure, the arbitrator may, in his discretion, make an award of reasonable attorneys' fees and disbursements incurred by the Company in connection with the arbitration. Except in the case of claims for discrimination, the arbitrator shall have no authority to award punitive damages.

(c) Executive and the Company agree that all matters pertaining to the arbitration shall be kept confidential including, but not limited to, the existence of the arbitration, any pleadings, briefs or other documents exchanged, any testimony or other oral submissions and/or any awards. Accordingly, Executive and the Company agree that the foregoing shall not be disclosed, except to Executive's and the Company's legal counsel, tax advisors or any other person necessary to the conduct of the arbitration, except that such information may be disclosed as required by law or by the Company for legitimate business purposes.

(d) Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof and be enforced accordingly. The decision of the arbitrator is final, conclusive and binding on the parties to the arbitration. Executive hereby irrevocably waives any objection to venue (including any objection based on inconvenient or improper forum) of any action or proceeding to enforce any arbitrator's award or any other matter related to such arbitration proceeding.

25. *Section 409A.* It is intended that the provisions of this Agreement either be exempt from or comply with Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations thereunder as in effect from time to time (collectively, hereinafter, "**Section 409A**"), and all provisions of this Agreement shall be construed and interpreted in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A. Executive shall not be entitled to any Severance Payments until Executive's termination of employment constitutes a "separation from service" within the meaning of Treasury Regulation Section 1.409A-1(h). If, at the time of Executive's separation from service (within the meaning of Section 409A), (a) Executive shall be a specified employee (within the meaning of Section 409A and using the identification methodology selected by the Company from time to time) and (b) to the extent the Severance Payments are deferred compensation subject to 409A, then the Company (or its affiliate, as applicable) shall not pay such amounts on the otherwise scheduled payment date but shall instead accumulate such amounts and pay them, without interest, on the first business day after such six-month period. For purposes of Section 409A, each installment payment will be deemed to be a separate payment as permitted under Treasury Regulation Section 1.409A-2(b)(2)(iii). Notwithstanding any provision of this Agreement, except to the extent any expense, reimbursement or in-kind benefit provided pursuant to this Agreement does not constitute a "deferral of compensation" within the meaning of Section 409A: (i) the amount of expenses eligible for reimbursement or in-kind benefits provided to Executive during any calendar year will not affect the amount of expenses eligible for reimbursement or in-kind benefits provided to Executive in any other calendar year, (ii) the Company shall reimburse Executive for expenses for which he or she is entitled to be reimbursed on or before the last day of the calendar year following the calendar year in which the applicable expense is incurred, and (iii) the right to payment or reimbursement or in-kind benefits hereunder may not be liquidated or exchanged for any other benefit. Notwithstanding any provision of this Agreement, in light of the uncertainty with respect to the proper application of Section 409A, the Company reserves the right to make amendments to this Agreement as the Company deems necessary or desirable to avoid the imposition of taxes or penalties under Section 409A. In any case Executive is solely responsible and liable for the satisfaction of all taxes and penalties that may be imposed on Executive (including any taxes and penalties under Section 409A), and none of the Company or any affiliate shall have any obligation to indemnify or otherwise hold Executive harmless from any or all of such taxes or penalties. The Company makes no representations concerning the tax consequences of Executive's participation in this Agreement under Section 409A or any other Federal, state or local tax law. Executive's tax consequences shall depend, in part, upon the application of relevant tax law, including Section 409A, to the relevant facts and circumstances. Executive should consult a competent and independent tax advisor regarding the tax consequences of this Agreement.

26. *Governing Law.* This Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws provisions.

*[Signature Page Follows.]*

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

                        **RELEVENT SPORTS, LLC**

                        By: RSE Ventures, LLC, Its Sole Member

By: _____
       Name: Matthew Higgins
       Title: Chief Executive Officer

**EXECUTIVE**

_____
Charlie Stillitano

*[Signature Page to Employment Agreement]*

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

        **RELEVENT SPORTS, LLC**

        By: RSE Ventures, LLC, Its Sole Member

        By: _____
             Name:  Matthew Higgins
             Title:   Chief Executive Officer

**EXECUTIVE**

_/s/ Charlie Stillitano_
Charlie Stillitano

*[Signature Page to Employment Agreement]*

**EXHIBIT A**

**Permitted Activities**

- Serving as the radio daily talk show host for The Football Show for SiriusXM FC 85, SiriusXM's all soccer channel.

# EMPLOYEE COVENANTS AGREEMENT

THIS EMPLOYEE COVENANTS AGREEMENT (this "**Covenants Agreement**") dated as of June 21, 2018 by and between Relevent Sports, LLC, a Delaware limited liability company (the "**Company**"), and Charlie Stillitano ("**Executive**").

WHEREAS, the Executive entered into an employment agreement, dated as of the date hereof, with the Company (the "**Employment Agreement**");

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in the Employment Agreement, and for other good and valuable consideration, it is hereby covenanted and agreed by Executive and the Company as follows:

1. *Confidentiality and Non-Disclosure*. (a) Executive understands that during Executive's employment Executive shall have access to confidential and proprietary information (the "**Confidential Information**") of the Company and its parents, subsidiaries and affiliates (the "**Company Group**"). Executive may also receive Confidential Information prior to the actual commencement of Executive's employment. Beginning on the date Executive executes this Covenants Agreement Executive may not use, divulge, disclose or otherwise make accessible to any other person or entity any Confidential Information except (i) while employed by the Company, in the business of and for the benefit of the Company Group or (ii) as otherwise required by law. In this connection, if Executive receives a subpoena or request for disclosure of Confidential Information, Executive agrees to provide prompt written notice to the Company prior to responding to such subpoena or request. Executive further agrees to cooperate with the Company Group in taking appropriate steps to maintain the confidentiality of the Confidential Information. These obligations shall remain in effect during the period of Executive's employment and after the termination thereof, regardless of the reason for such termination.

(b) For purposes of this Covenants Agreement, "**Confidential Information**" means any non-public information (whether oral, written or contained on computer systems or other media) relating to the business or affairs of:

(i) the Company Group;

(ii) any existing or former client of the Company Group;

(iii) any existing or former officer, director, employee or shareholder of the Company Group; and

(iv) any consultants, vendors or such other third parties whose information the Company Group has an obligation to protect wherever and however obtained.

(c) "**Confidential Information**" includes, but is not limited to:

(i) information concerning finances, strategic or financial plans, business plans, trade secrets, intellectual property and Developments (as defined below), methods, techniques, operations, investments, project information, marketing plans, future transactions, employee lists and employees' compensation and management's compensation;

(ii) information encompassed in materials, surveys, charts, drawings, designs, plans, proposals, reports, research, marketing and sales plans, costs, quotations, specification sheets and recording media; and

(iii) information that relates directly or indirectly to the computer systems and computer technology of the Company Group including, but not limited to, source codes, object codes, reports, flow charts, screens, algorithms, use manuals, installations and/or operation manuals, computer software, spreadsheets, data computations, formulas, techniques, databases and any other form or compilation of computer-related information.

(d) Executive's obligations with respect to Confidential Information shall continue after Executive's employment with the Company, regardless of whether Executive resigns, with or without Good Reason, or Executive's employment is terminated, with or without Cause. Nothing in this Covenants Agreement prohibits Executive from reporting possible violations of law or regulation to an appropriate governmental agency or entity and that pursuant to the federal Defend Trade Secrets Act of 2016, the Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(e) Furthermore, Executive acknowledges and agrees that if Executive joins a Competitive Business (as defined below) subsequent to the cessation of Executive's employment, any of the Confidential Information, proprietary information and intellectual property (including Developments) obtained by Executive during Executive's employment would benefit Executive and be subject to the risk of inevitable disclosure in the course of any new position Executive may hold to the competitive disadvantage of the Company Group.

(f) Executive further understands that it is the Company Group's policy not to use or accept any confidential information of third parties (including Executive's former employers) without appropriate written authorization. Executive may not use or disclose to the Company Group or any of its affiliates such confidential information of third parties without written authorization approved by the Company.

2. *Return of Confidential Information and Other Items*. Upon Executive's resignation or the termination of Executive's employment for any reason, Executive shall promptly deliver to the Company all Confidential Information (in whatever form or media, including all drafts, originals and copies) that is in Executive's possession, custody or control as well as any blackberries, pagers, computers, tablets, notebooks, cell phones, security cards, identification badges and any other electronic, security and other equipment or items issued by the Company Group.

3. *Non-Competition and Non-Solicitation of Customers or Clients*. Executive agrees that beginning on the date Executive executes this Covenants Agreement and continuing for one (1) year after the last date of Executive's employment with the Company, Executive shall not: (a) directly or indirectly engage in any business (whether as an employee, consultant, director, officer, partner, member, investor or shareholder) that is a Competitive Business; or (b) directly or indirectly seek to diminish the relationships between the Company Group and any of their investors, clients, customers, sponsors, collaborators, participant soccer clubs or teams, vendors or service providers or seek, directly or indirectly,

to divert such relationships for Executive's personal benefit or to such firm or other person or entity with whom Executive may then be employed or otherwise associated.

4. *Non-Solicitation of Employees and Non-Hire*. Executive agrees that beginning on the date Executive executes this Covenants Agreement and continuing for one (1) year after the last date of Executive's employment, Executive shall not directly or indirectly (a) solicit or induce, or cause others to solicit or induce, any Restricted Person (as defined below) to terminate his or her employment with the Company Group or to accept employment with any entity other than the Company Group, or (b) hire or facilitate the hiring of any Restricted Person by any entity other than the Company Group. For purposes of this Covenants Agreement, "**Restricted Person**" means any person who is employed by the Company Group as of the last date of Executive's employment with the Company Group or who was employed by the Company Group within the one (1) year period immediately prior to such date.

5. *Competitive Business*. For purposes of this Covenants Agreement, "**Competitive Business**" means (a) a business that is in competition with any business of the Company Group; and (b) any business, profession, or other endeavor that directly or indirectly engages in the staging, organization, promotion, marketing or commercialization of international soccer events or rights related thereto, anywhere in the world. For purposes of this Agreement, Creative Artists Agency, William Morris Endeavor, Wasserman Media Group, Lagardere Unlimited and their respective affiliates shall be deemed to be Competitive Businesses.

6. *Non-Disparagement*. Executive shall not, beginning on the date Executive executes this Covenants Agreement, and continuing during or at any time subsequent to Executive's employment, disparage the Company Group and/or its present or former directors, officers, shareholders, members, investors, employees or clients, whether directly or indirectly, in any manner whatsoever (whether related to the business of the Company Group or otherwise), except as otherwise required by law. For the avoidance of doubt, business-related communications, including, but not limited to, statements about work performance, criticism of work performance or information related to cessation of employment, do not constitute disparaging statements and shall not violate this Section 6. In response to any request for employment reference or verification, the Company confirms that it will provide only neutral information, including Executive's job title and dates of employment with the Company. In addition, pursuant to applicable law, the filing of any legal action by the Company Group or Executive does not constitute disparagement and shall not violate this Section 6.

7. *Intellectual Property Assignment*. (a) To the maximum extent permitted by applicable law, Executive hereby irrevocably assigns, grants and conveys to the Company all right, title and interest in, to and under any and all inventions, works of authorship (including computer programs), marks, logos, Internet domain names, trade dress, data, designs, ideas, concepts, strategies, analyses, research, processes and improvements, whether or not patentable and whether or not subject to copyright, that are discovered, developed, created, made, conceived or reduced to practice, whether or not during regular working hours, by Executive, either solely or jointly with others, during the period of Executive's employment with the Company, including in each case any past, present or future intellectual property rights therein (collectively, "**Developments**"). The foregoing applies to any Development that is (i) derived from work performed for the Company Group or from the use of the resources (including equipment, supplies, facilities, trade secrets, confidential information and know-how) of the Company Group, (ii) relates to the Company Group's line of business or that of any affiliate thereof or any actual or demonstrably anticipated research or development of the Company Group or (iii) results from or is suggested by any activity that Executive conducts for the Company Group. Without limitation of the foregoing, any Development that may qualify as a "Work Made for Hire" as defined in 17 U.S.C. §101 et seq. is and

3

shall be deemed a Work Made for Hire, with initial ownership of such Development vesting in the Company.

(b) Executive shall provide the Company with prompt written notice of any Development that Executive, alone or jointly with others, discovers, develops, creates, makes, conceives or reduces to practice during Executive's employment with the Company. Executive shall, at all times during and following Executive's employment with the Company and without additional compensation to Executive, take all steps reasonably necessary to effect the intent of this Section 7, including executing any applications, assignments or instruments that the Company deems necessary, and reasonably assist the Company Group's efforts (at the Company's expense) in obtaining, prosecuting, maintaining, defending and enforcing any patent, copyright, trademark, trade secret or other intellectual property right, protection or registration with respect to Developments in the United States or any other country. Executive hereby appoints each of the Company's managers, acting severally, as Executive's attorney-in-fact to execute any documents described in the foregoing sentence on Executive's behalf.

(c) Executive agrees and represents that, except as disclosed by Executive in writing prior to the commencement of Executive's employment with the Company, as of the date of this Covenants Agreement, Executive has no rights to any intellectual property previously made or acquired by Executive.

(d) No provision of this Covenants Agreement is intended to require Executive to assign any right to any Development that was developed entirely on Executive's own time, and for which no equipment, supplies, facilities, trade secrets, confidential information or know-how of the Company Group was used, unless (i) the Development relates, at the time of conception or reduction to practice of the Development, (x) to the business of the Company Group or (y) to the actual or demonstrably anticipated research or development of the Company Group, or (ii) the Development results from any work performed by Executive for the Company Group. Executive hereby acknowledges receipt of notice of this limitation.

8. *Scope and Breach of Restrictive Covenants*. (a) Executive agrees that the foregoing terms, conditions, and restrictions are fair and reasonable, are reasonably required for the protection of the Company Group and that if Executive's employment with the Company were to terminate, such restrictions would not preclude Executive from securing suitable employment commensurate with Executive's skills and abilities. Executive acknowledges that the terms, conditions, and restrictions are ancillary to an otherwise enforceable agreement, including without limitation, (i) the Employment Agreement and (ii) the promise by the Company to provide Executive with immediate access to Confidential Information of the Company in return for Executive's promise not to disclose that information. Executive also understands, acknowledges and agrees that the Company Group shall not have an adequate remedy at law for a violation of the provisions hereof, and that the Company Group shall have the right to have such provisions enforced by way of temporary restraining order or injunction against any breach or threatened breach of such terms, conditions and restrictions, or any other equitable relief, in addition to and not in lieu of any other rights the Company Group may have at law or otherwise under this Covenants Agreement.

(b) Any action for a temporary restraining order, injunction, or other equitable relief brought to enforce the terms hereof may be brought only in the courts of the State of New York, New York County, or in the United States District Court for the Southern District of New York. By Executive's execution and delivery of this Covenants Agreement, Executive submits to the exclusive jurisdiction of the above-referenced courts, waives any objection to such jurisdiction on

the grounds of venue or forum *non conveniens* or any similar grounds, consent to service of process by mail or in any other manner permitted by law, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Covenants Agreement. This consent to jurisdiction shall not be deemed to confer rights on any person other than the Company Group.

    (c) Notwithstanding anything to the contrary herein, if the Company Group seeks to enjoin Executive's alleged violation of any restriction in this Covenants Agreement, Executive agrees that the Company Group may bring the action in any court or before any judicial body having jurisdiction over such a claim.

    (d) In the event Executive violates any of the terms of this Covenants Agreement, Executive agrees to indemnify, hold harmless and reimburse the Company Group for any and all losses, costs, fees (including, without limitation, reasonable attorneys' fees), expenses, disbursements, and damages of the Company Group in connection with the enforcement hereof.

  9. *Application and Survival of Covenants*. Executive understands and agrees that the restrictions contained herein are intended to, and shall, apply from the date hereof through their respective periods of applicability (including for perpetuity, if applicable), regardless of whether Executive's employment with the Company is terminated by the Company or by Executive, and regardless of the reason. Further, Executive understands and agrees that, in the event Executive's employment with the Company is terminated, whether by the Company or by Executive, and regardless of the reason, the restrictions contained herein, as well as all other applicable terms, conditions, and provisions of this Covenants Agreement, shall survive.

  10. *Notices*. All notices required or permitted under this Covenants Agreement shall be in writing and shall be sufficiently given if personally delivered or sent by certificated mail, postage prepaid, with return receipt requested or sent by reputable overnight courier addressed as follows:

  If to the Company:

  Relevent Sports, LLC
  c/o RSE Ventures, LLC
  423 West 55th Street, 11th Floor
  New York, NY 10019
  Attention: Abraham Rondina, Esq.

  With copies (which shall not constitute notice) to:

  Paul Hastings LLP
  200 Park Avenue
  New York, New York 10166
  Attention: Stefan G. dePozsgay, Esq.

  If to Executive:

  At the most recent address provided by Executive to the Company for human resource purposes.

  11. *Modification; Entire Agreement*.

    (a) With the exception of any trade secret acknowledgment or similar agreement signed by Executive during the course of Executive's employment, the Employment Agreement

5

(including the appendices, annexes and exhibits attached thereto), this Covenants Agreement and the Note (as defined in the Employment Agreement) contain the entire understanding of the parties regarding the terms and conditions of Executive's employment and none of the Employment Agreement, this Covenants Agreement and the Note may be modified except by a signed document approved and executed by the Company and Executive.

(b) Executive acknowledges that, in executing this Covenants Agreement, Executive has not relied on any oral or written representations or understandings other than those explicitly contained herein.

(c) This Covenants Agreement, the Employment Agreement and the Note supersede any and all oral or written understandings regarding the terms and conditions of Executive's employment with the Company Group.

12. *Waiver*. The waiver by either party hereto of a breach of any provision of this Covenants Agreement shall not be construed as a waiver of any subsequent breach. The failure of either party hereto to insist on strict adherence to any provision of this Covenants Agreement on one or more occasion(s) shall not be considered a waiver or deprive that party of the right thereafter to insist on strict adherence to that provision or any other provision of this Covenants Agreement.

13. *Assignment*. This Covenants Agreement shall be binding on and shall inure to the benefit of Executive and Executive's heirs, assigns, executors, administrators and other legal representatives and shall be binding on and shall inure to the benefit of the Company Group, successors and assigns, including, without limitation, any corporation or other entity into which the Company is merged or which acquires all or substantially all of the assets of the Company. This Covenants Agreement is not assignable by Executive without the Company's written consent, and any attempt to do so shall be void. The Company reserves the right to assign this Covenants Agreement to its affiliates, successors and assigns. Furthermore, Executive agrees that Executive's obligations under this Covenants Agreement apply equally to any position that Executive may hold with any member of the Company Group, including any investment funds or limited partnerships sponsored by the Company.

14. *Counterparts*. This Covenants Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

15. *Severability*. It is the intent and understanding of each party hereto that if any term, restriction, covenant or promise is found to be unenforceable by a court or tribunal of competent jurisdiction, then such term, restriction, covenant or promise shall be deemed modified to the minimal extent necessary to make it enforceable. If any provision of this Covenants Agreement is declared void or unenforceable by a court or tribunal of competent jurisdiction, all other provisions shall nonetheless remain in full force and effect.

16. *Governing Law*. This Covenants Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws provisions.

IN WITNESS WHEREOF, the undersigned have caused this Covenants Agreement to be duly executed as of the date first above written.

**RELEVENT SPORTS, LLC**

By: RSE Ventures, LLC
Its Sole Member

By: _____
Name: Matthew Higgins
Title: Chief Executive Officer


EXECUTIVE


_____
Charlie Stillitano

*[Signature Page to Employee Covenants Agreement]*

IN WITNESS WHEREOF, the undersigned have caused this Covenants Agreement to be duly executed as of the date first above written.

**RELEVENT SPORTS, LLC**

By: RSE Ventures, LLC
Its Sole Member

By: _____
Name: Matthew Higgins
Title: Chief Executive Officer

EXECUTIVE

_____
Charlie Stillitano

*[Signature Page to Employee Covenants Agreement]*