M4ITRELA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RELEVENT SPORTS, LLC,

                    Plaintiff,

            v.                              22 CV 2917 (VM)
                                            Remote proceeding
CARMELO STILLITANO,

                    Defendant.

------------------------------x
                                            New York, N.Y.
                                            April 18, 2022
                                            2:00 p.m.

Before:

                      HON. VICTOR MARRERO,

                                            District Judge


                      APPEARANCES (Telephonic)

GIBSON, DUNN & CRUTCHER LLP
     Attorneys for Plaintiff
BY:  HARRIS MUFSON

DAVIDOFF HUTCHER & CITRON LLP
     Attorneys for Defendant
BY:  LARRY HUTCHER

M4ITRELA

1          (Via teleconference)

2          THE COURT:  This is Judge Victor Marrero and this is a

3    proceeding in the matter of Relevent Sports v. Stillitano.

4          The Court scheduled this proceeding as a hearing on

5    the request of Relevent Sports' restraining order and temporary

6    preliminary injunction which the Court granted a week ago and

7    asked the parties to submit their written papers by today,

8    actually by Friday.

9          The Court has received and reviewed the papers

10   submitted by the parties very closely, so we're here to hear

11   the parties' supplemental arguments, if any.  I would advise

12   not to repeat what you already exhaustively set forth in your

13   memoranda of law and the declarations that go along with them,

14   instead, focus on some important threshold issues that the

15   Court has identified and on which I believe it would be most

16   productive for the parties to guide their arguments.

17         Before we proceed, let me make sure we have the court

18   reporter on this line.

19         COURT REPORTER:  Good afternoon, your Honor, yes, you

20   do, it's Michael McDaniel, the court reporter.

21         THE COURT:  Thank you.

22         As the parties are aware, there is an underlying

23   arbitration proceeding going on relevant to this action before

24   this Court.  In that arbitration proceeding, there are a number

25   of issues that I consider threshold disputes, factual disputes

M4ITRELA

1    between the parties which would need to be resolved by the

2    arbitrator.  Some of those questions include whether

3    Mr. Stillitano's salary reduction in 2021 was by mutual

4    agreement or was it a unilateral imposition by Relevent?  Did

5    that reduction represent deferred compensation and did

6    Mr. Stillitano object to the reduction?  And if so, how was

7    that expressed?

8            Another factual dispute that is threshold here is:

9    Was Mr. Stillitano's termination of employment by Relevent

10   without cause and without consent or was he terminated at his

11   request so as to qualify for severance pay?

12           I do not believe it would be productive for discussion

13   of these factual disputes in this proceeding insofar as they

14   are critical issues that are to be resolved in the arbitration

15   proceeding.  However, there is a question that arises.  The

16   arbitration proceeding, of course, is pursuant to the

17   employment agreement.  The action before this Court flows out

18   of the parties' covenants agreement, and so one question is:

19   What is the relationship between the employment agreement and

20   the covenants agreement?

21           Out of that question there arises another, which is:

22   To what extent is there anything in the parties' underlying

23   understanding and agreements indicating that a violation of the

24   employment agreement would nullify the covenants agreement?

25           The implication of that issue for this proceeding is

M4ITRELA

whether, to the extent there is uncertainty between the two

agreements, whether it would be more prudent for this Court to

stay further proceedings here while the parties conclude the

arbitration, and depending upon which way the arbitration goes,

of course, if there is an end to the relationship between the

two agreements that then could be dispositive of the action

before this Court.

There is another major factual issue which would be an

important question, which is:  Was Relevent aware of

Mr. Stillitano's business activities after his termination, and

if so, when did Relevent become aware of it and did it express

objections?

Another question arises concerning the termination of

Mr. Stillitano and its connection to the covenants agreement.

Apparently Mr. Stillitano was terminated in May of 2021, so one

important question is:  To what extent does the covenants

agreement effectively expire on May 7 of this year, and if so,

what is the practical effect of that expiration on this

proceeding?

There is a major dispute among the parties also

concerning whether or not the restrictive covenant as to

geography and duration is reasonable, and there's a major

difference between the parties as well as to whether or not

Relevent has made a sufficient case of irreparable harm.

So those are some preliminary thoughts on the issues

M4ITRELA

| | |
|---|---|
| 1 | of the parties to be focused on at this hearing.  Let me ask |
| 2 | that each of you have an initial ten minutes for argument and |
| 3 | then we'll determine to what extent any more is indicated. |
| 4 | Let's proceed then with the presentation on behalf of |
| 5 | Relevent, the plaintiff. |
| 6 | MR. MUFSON:  Thank you, your Honor, this is Harris |
| 7 | Mufson from Gibson Dunn on behalf of plaintiff Relevent Sports. |
| 8 | I will do my best to address the list of issues that |
| 9 | you laid out during the course of my presentation, and I will |
| 10 | do also my best not to belabor the submissions that are already |
| 11 | before the Court. |
| 12 | So Mr. Stillitano concedes that he has breached his |
| 13 | non-competition and non-solicitation agreement with Relevent. |
| 14 | That is not disputed.  He acknowledges that he and his business |
| 15 | partners have been replicating Relevent's core business by |
| 16 | organizing soccer matches involving the same European soccer |
| 17 | clubs at the same venues and with the same media partners.  In |
| 18 | fact, he's attempting to replicate the same match at the same |
| 19 | location that he organized during his employment with Relevent. |
| 20 | Stillitano's opposition identifies quote, unquote, the |
| 21 | principal issue before the Court is whether the restrictive |
| 22 | covenant is enforceable, and in arguing that the restrictive |
| 23 | covenant is unenforceable, Mr. Stillitano raises a number of |
| 24 | arguments, none of which are viable, and I'm going to address |
| 25 | each of those in sequence. |

M4ITRELA

1          First, Mr. Stillitano argues that Relevent breached

2    his employment agreement by reducing his salary in May of 2020

3    and not paying him all of the severance benefits that are set

4    forth in the employment agreement.  And I understand, Judge

5    Marrero, that you raise a question about that, too, which I

6    will address.

7          No question there are factual disputes about that

8    issue.  Relevent disputes that the salary reduction was

9    characterized as a deferral or that Mr. Stillitano was ever

10   promised that he would be made whole, but what I want to focus

11   on are the undisputed facts.  So it is undisputed that

12   Mr. Stillitano's salary was reduced in May of 2020.  It is also

13   undisputed that in June of 2020, Mr. Stillitano sent a letter

14   to Relevent and requested that Relevent restore his base salary

15   to $625,000, which is Exhibit C to Mr. Stillitano's affidavit.

16         I will note that in that letter Mr. Stillitano refers

17   to the reduction as a salary reduction and not a deferral, but

18   regardless, that letter was sent.  Relevent, after receiving

19   that letter, rejected Mr. Stillitano's request.  It never

20   raised Mr. Stillitano's salary, maintaining it at $200,000

21   during the remainder of his employment.

22         Mr. Stillitano did not resign for good reason, which

23   is set forth in his employment agreement, and I will come back

24   to that in a moment.  Instead, he received the $200,000 in

25   salary and continued to perform his role as executive chairman

M4ITRELA

1    for over a year until May 7, 2020.  It's also undisputed that

2    Mr. Stillitano electronically acknowledged his $200,000 salary

3    on two separate occasions during the remainder of his

4    employment.

5         Now Mr. Stillitano's employment contract, the

6    employment agreement, provided that he could be terminated at

7    any time by the company with or without cause, or by

8    Mr. Stillitano for any reason, meaning he was employed at will.

9    And Mr. Stillitano concedes that point at page 14 of his brief.

10        Now it is settled law that an employer's unilateral

11   changes to compensation do not constitute a breach of contract

12   where, as here, an at-will employee ratifies the change by

13   remaining employed and accepting the reduced compensation, and

14   we cited the *Giannone* case and the *Campeggi* case in our brief

15   that stand for that proposition.

16        This proposition is true even where an employment

17   agreement contains a modification provision requiring a signed

18   document approved by the executive and the company to modify

19   the agreement.  For example, in *Corel v. Clark*, 514 N.Y.2d 766,

20   767, the Second Department held the fact that an original

21   agreement in that case required amendments or modification in

22   writing is not dispositive if the evidence taken as a whole

23   shows that the amendment was authentic or was ratified by the

24   party's conduct.

25        Mr. Stillitano cites a single case in support of his

M4ITRELA

1   argument, which is the *Gootee* case from the First Department in

2   2016.  He miscites that case.  In *Gootee*, the First Department

3   did not agree that the employer breached the employment

4   agreement by reducing the employee's salary and benefits

5   without a signed writing in that case.  Instead, the Court

6   merely held that there were factual issues precluding summary

7   judgment for either party.  The *Gootee* decision actually

8   supports Relevent's position because the court in that case

9   acknowledged that a fact finder could conclude that the former

10  employee ratified the alterations of the terms and conditions

11  of his employment by continuing to perform his role as a

12  consultant.

13          So here, because Stillitano indisputably accepted the

14  reduced salary, Relevent did not breach the agreement by

15  reducing his salary.  It paid him all of the compensation that

16  he earned in accordance with the employment agreement.

17          I will just pause here also to note that even the

18  allegations on their face by Mr. Stillitano that there was some

19  sort of oral promise to him that was made that he would be made

20  whole is violative of the statute of frauds.  It is ambiguous,

21  vague, even on its face, the allegation, and it's not clear

22  that that could be performed within one year.  So there are

23  also legal defenses, not just factual defenses to the arguments

24  that were raised by Mr. Stillitano.

25          THE COURT:  Mr. Mufson, let me point out that you've

M4ITRELA

1    used up most of your time already and you have not reached the

2    threshold question that I posed, which is to what extent is

3    there a connection between the employment agreement, which is

4    the subject of arbitration, and the covenants agreement, which

5    is the subject of this issue?  Is there anything in the record

6    to suggest that a violation of the employment agreement

7    nullifies the covenants agreement?

8            If that's the case, why should the Court not stay this

9    matter pending the arbitration?

10           MR. MUFSON:  So your Honor, there is nothing in the

11   employment agreement that states on its face or otherwise

12   indicates that a breach of the employment agreement nullifies

13   the covenants agreement.  Actually to the contrary, directing

14   your attention to paragraph 9 of the covenants agreement, which

15   is Exhibit 1 to the verified complaint in this case, paragraph

16   9 says that Mr. Stillitano understood and agreed that the

17   restrictions contained in the covenants agreement are intended

18   to and shall apply from the date hereof through respective

19   periods of applicability regardless of whether executive's

20   employment with the company is terminated by the company or by

21   the executive, and regardless of the reason, meaning if the

22   company had good reason -- excuse me, if Mr. Stillitano

23   established good reason, which in his employment agreement

24   includes a reduction of his salary, that would give him good

25   reason to resign.  Paragraph 9 makes clear that he is still

M4ITRELA

1    bound by the restrictive covenants because it applies for any

2    reason whatsoever and regardless of the reason for his

3    termination.

4            That paragraph continues that Mr. Stillitano

5    understood and agreed that in the event his employment with the

6    company is terminated, again whether by the company or by him

7    and regardless of the reason, the restrictions contained herein

8    as well as all other applicable terms, conditions and

9    provisions of this covenants agreement shall survive.

10           So we submit, your Honor, that they are distinct, that

11   even if Mr. Stillitano proves in arbitration that Relevent

12   breached the agreement, which we don't think we did because he

13   ratified the change, these are two separate agreements, that he

14   still has to abide by the covenants agreement.  He can't

15   compete with us.

16           If he wins in arbitration, he can collect monetary

17   damages.  He can get the back pay that he believes he's

18   entitled to.  He can get the severance he believes he's

19   entitled to.  We believe he's not entitled to any of it because

20   he ratified the change to his base salary and accepted it, and

21   in addition, he never signed a release in the form acceptable

22   to Relevent, and therefore is not entitled to any severance.

23           So there are factual disputes about that, but we

24   believe these are separate issues and he should be bound to the

25   non-compete that he agreed to and agreed that would apply

M4ITRELA

1    regardless of any reason for his termination, particularly

2    through May 7.

3            We believe it should be extended due to inappropriate,

4    bad faith conduct that occurred, which I'm happy to address as

5    well, and that's in the submissions to the Court, but at a

6    minimum --

7            THE COURT:  Mr. Mufson, take one more minute and

8    address the question of what authority there is for the

9    covenant to remain in effect past May 7 of this year.

10           MR. MUFSON:  Well, we believe that we're entitled to

11   equitable relief, your Honor.  In our brief, we cite cases

12   standing for the proposition that courts, particularly in light

13   of the facts and circumstances here where Relevent was duped

14   and led to believe that Mr. Stillitano would comply with his

15   restrictive covenants agreement, all the while, he was using

16   third parties' proxies to compete behind Relevant's back and do

17   precisely what he is contractually obligated not to do and

18   organize the same soccer matches with the same teams about

19   which he had highly proprietary confidential information which

20   undoubtedly causes irreparable harm to Relevent.

21           Mr. Stillitano has intimate knowledge of Relevent's

22   contractual agreements with these parties, the fee rights

23   agreement that they negotiated, the contacts that they have at

24   these venues, these are extremely rare and highly sophisticated

25   contacts and agreements.  This is a very small universe in

M4ITRELA

1    terms of the soccer events business, and Mr. Stillitano is an

2    extremely unique position given his high profile nature in the

3    industry and all of the information that he gleaned during his

4    employment with Relevent, to then turn around and overtly and

5    brazenly breach his covenants agreement, all the while telling

6    Relevent that he was intending to comply and hiding that

7    information from us, we submit, your Honor, provides the Court

8    with ample basis to extend the term of the non-compete during

9    the period of non-compliance.

10          I would say there was one question the Court asked,

11   whether or not the Court should stay proceedings pending the

12   disposition of the arbitration.  For the reason that I

13   articulated in paragraph 9 of the restrictive covenants

14   agreement, we view these as separate agreements, but

15   regardless, if the Court does maintain the TRO in place

16   through, at a minimum, through May 7, that at least would

17   somehow mitigate some of the damage, but if the Court vacates

18   the TRO there's no way that Relevent will be able to make up

19   that irreparable harm that it will suffer.  It can win at the

20   arbitration and still suffer the irreparable harm by virtue of

21   Mr. Stillitano overtly competing with us during the remainder

22   of the non-compete period which will dramatically and

23   drastically and permanently harm Relevant's business.

24          THE COURT:  Thank you.

25          Let me then turn to Mr. Stillitano.  It's Mr. Hutcher?

M4ITRELA

1        MR. HUTCHER:  Yes, good afternoon, your Honor, Larry

2   Hutcher of Davidoff Hutcher & Citron for the defendant Charlie

3   Stillitano.

4        First of all, your Honor, there is no doubt that this

5   restrictive covenant agreement is incorporated in the

6   employment agreement.  There is an express clause in the

7   employment agreement, paragraph 13, that states restrictive

8   covenants applicable to executive which executive agrees to

9   comply with fully and which executive acknowledges shall be

10  strictly enforced by the company as set forth in the employee's

11  covenant agreement.  So it is clear that it is to be construed

12  as an integral part of the employment agreement.  Therefore, a

13  breach of the employment agreement, by necessity, must also

14  impact the restrictive covenant agreement.  For counsel to

15  argue they are separate and distinct is simply not a good faith

16  argument, that they argue they could stop making any payment

17  after day one and then that he would still be subjected to a

18  non-compete is just simply nonsensical.

19        What is interesting, Judge -- and I want to point out

20  with respect to the arguments that Charlie accepted this, what

21  counsel has failed to address is an integral part of our

22  claimed breach which is that the severance that they had agreed

23  to pay to Stillitano was first in the amount of $650,000.  If

24  Stillitano had agreed to a redaction in his salary, the amount

25  that they would have paid under severance at that time would

M4ITRELA

1    have been 200,000.  Indeed, they didn't pay 200,000, they

2    agreed to pay him 650,000, and they breached the agreement by

3    not paying him 650,000 in 12 months as required under the

4    agreement but they unilaterally decided to pay it over 24

5    months.  That, in and of itself, is a clear breach of the

6    contract that nullifies the enforceability of the restrictive

7    covenant.

8         Second -- and if I'm going too quick, your Honor, I

9    apologize, but I want to stick to the limit.

10        You asked whether Relevent was aware of Stillitano's

11   competitive acts.  We have attached documentary evidence to the

12   moving papers consisting of text exchanges that show as early

13   as November 2021 that Relevent not only knew of the fact that

14   Stillitano was competing, the president of the company,

15   Sillman, received an inquiry from a reporter concerning

16   Charlie's acts and Sillman said to the reporter:  This isn't

17   us, this is Stillitano.  Why don't you reach out to him?

18        And then the following month Stillitano tells Sillman:

19   I'm going to Milan to meet with Serie A to do work on soccer

20   matters -- which would have been a clear violation of the

21   restrictive covenant.  And what does Sillman say to him?  Good

22   luck.  Have safe travels.  Why don't you do this, come back and

23   come to our Christmas party.  Love you.

24        Your Honor, if somebody has been breaching an

25   agreement and has violated a restrictive covenant, do you tell

M4ITRELA

1  them, "Love you?"  Do you tell them come to the Christmas

2  party, and after you come to the Christmas party do you say,

3  "Great to see you, wish you well?"  Your Honor, that is not the

4  actions of a company that believes somebody has violated a

5  restrictive covenant.  That's just not the way companies act.

6      Relevent knew that they had breached the contract by

7  failing to pay Charlie the agreed-upon salary and they knew he

8  had to earn a living.  The restrictive covenant that he entered

9  into denies him any ability to live.  Stillitano has not earned

10  a dime from soccer.  He made a few bucks by announcing things

11  on the radio, and he actually had to go out and mortgage his

12  home in order to survive.  This restrictive covenant is so

13  broad in terms of geographic scope and duration that it is

14  clearly unenforceable and it should be vacated.

15      Your Honor asked what the practical effect of the

16  restrictive covenant's expiration was on May 7, 2022.  It is

17  clear that the only ability that this Court has is to keep the

18  status quo.  Any extension of that TRO beyond May 7 would

19  constitute a clear violation of well-established rules.  And I

20  refer your Honor to the case of *Benihana, Inc. v. Benihana of*

21  *Tokyo, LLC*, 784 F.3d, 887.  And the court in that case held

22  where the parties have agreed to arbitrate a dispute, a

23  district court has jurisdiction to issue a preliminary

24  injunction to preserve the status quo pending arbitration.  It

25  can't do any more than that.  It doesn't have the ability to

M4ITRELA

extend the restrictive covenant beyond May 7.  I'm not

admitting, Judge, that it shouldn't even be immediately

vacated, but to the extent that it does exist, it cannot go

beyond May 7.

        Most important, your Honor, is this claim that

Relevent has suffered irreparable harm.  It is anything but the

case.  We have shown by documentary evidence that Relevent knew

as early as eleven months ago that Charlie was competing, and

not only did it not complain, it didn't take any action, and in

fact, assisted him by referring reporters to him.  The fact

that they stood on their rights in and of itself shows that

they have not suffered irreparable harm.

        I want to direct your Honor to a decision you rendered

in 2020 entitled *KDH Consulting Group v. Iterative Capital*

*Management* where you denied a preliminary injunction where the

plaintiff in that case knew of the breach in March 1, 2020, yet

didn't move for injunctive relief until April 18, 2020.  So

your Honor found where a five-week delay was in and of itself

sufficient to deny a preliminary injunction, here we have an

unequivocal delay of not less than eleven months.

        And your Honor, this is what is telling:  Even after

they served a cease and desist letter, they waited over five

weeks before submitting the application for a preliminary

injunction.  And in that application, Judge, they never

informed you that there was a pending arbitration.  It is clear

M4ITRELA

1    that Relevent has played fast and loose not only with Charlie

2    Stillitano, but the way they are bringing information before

3    this Court.  I am certain that Relevent was aware of

4    Stillitano's competition, they didn't act, and they are bound

5    by that failure.  That delay in moving by itself summarily

6    warranted the vacatur of the TRO and the denial of the

7    preliminary injunction.

8         As your Honor has said in other cases, in the

9    *Accenture* case, *Accenture LLP v. Spreng*, you said temporary

10   restraining orders and preliminary injunctions are among the

11   most drastic tools in the arsenal of judicial remedies and must

12   be used with great care.  Your Honor found that because there

13   were questions of fact that the -- you said, quote, the Court

14   finds that Accenture's request can be appropriately addressed

15   within the context of the arbitration and should be directed to

16   the arbitrator administering this arbitration.

17        Similarly, in this case, Judge, there is an existing

18   arbitration.  Whatever rights and remedies exist between the

19   parties should be determined in that arbitration.  The parties

20   in their contract, that Relevent is so anxious to enforce,

21   stated and agreed upon a method of dispute resolution.  That

22   was the arbitration.  And it is for that reason your Honor

23   should vacate the TRO, deny the preliminary injunction, and

24   direct the parties to the arbitration.

25        I think I have 40 seconds to spare, your Honor, but I

M4ITRELA

1    will waive those.

2            THE COURT:  Thank you.  Let me ask you one last

3    question.  In your papers you made a statement that is somewhat

4    vague that Mr. Stillitano was advised -- you don't indicate

5    whom, when, where and why -- the breach by reduction of his

6    compensation constituted an invalidation of the covenants

7    agreement.  This is basically coming back to the question that

8    I posed earlier.  Who advised Mr. Stillitano that there was

9    that connection and that, therefore, he was free to engage in

10   competitive activities not withstanding the covenants

11   agreement?

12           MR. HUTCHER:  Well, your Honor, I will readily admit

13   that it was we as counsel that told him that.  And the reason I

14   didn't submit a declaration was there was a concern that there

15   would be a waiver of the attorney-client privilege.  But we

16   have cited to many cases that hold that where a party

17   benefiting from a restrictive covenant in a contract breaches

18   that contract, the covenant is not valid and enforceable

19   against the other party.  So there is an overwhelming amount of

20   cases that stand for that proposition, and yes, it was me who

21   informed Mr. Stillitano that that breach was a reason that he

22   was free to act.

23           THE COURT:  All right.  Thank you.

24           I will give Mr. Mufson two minutes to rebut.

25           MR. MUFSON:  Your Honor, we appreciate the time, but

M4ITRELA

1    we did not have an opportunity to reply.  Ordinarily, we would

2    have had an opportunity to submit a reply submission.  Because

3    of the defendant's request for an accelerated hearing, we were

4    not given the opportunity to reply.  I thought that we were

5    going to be given a full opportunity to reply, so I would

6    appreciate, with leave of the Court, some additional time to

7    address a number of these arguments that were raised for the

8    first time in Mr. Stillitano's submission.

9              THE COURT:  All right.  Thank you.  I will give you

10   five minutes.

11             MR. MUFSON:  Okay.  Well, first of all, in terms of

12   the first argument about the separation between the employment

13   agreement and the covenants agreement, I will just note that

14   numerous courts, including the Second Circuit, have recognized

15   that an employer can lawfully withhold severance benefits when

16   an employee is actively breaching a valid restrictive covenant.

17   So the *Bradford* decision, 501 F.2d 51, a Second Circuit

18   decision, *Bausch & Lomb*, 630 F.Supp. 262.

19             So here, if there was a breach, for example, if

20   Relevent failed to pay the severance benefits, that is

21   something that can be adjudicated in arbitration, but the

22   parties agreed that they would adjudicate any breach of the

23   restrictive covenant agreement in court.  That's what the

24   agreement said.  There's a forum selection clause that

25   expressly permits Relevent to seek injunctive relief in this

M4ITRELA

Court.

So the issue is before this Court whether or not the
restrictive covenant is valid and is breached.  That's the
issue for this Court, not an issue for the arbitration.  And by
the time an arbitrator reaches a decision on that issue, it
could be a year from now.  And what can they do?  They can't
put the genie back in the bottle if this Court does not address
the fundamental question of whether or not the non-compete is
enforceable.  And we submit, your Honor, that it is fully
enforceable, that the agreement is narrowly tailored, it does
not prohibit Mr. Stillitano from working in the entire soccer
industry, which is unlike any of the cases that are cited by
Mr. Stillitano in his brief, that it's very narrowly
restrictive, that it only prohibits him from directly
interfering with our relationship with our business partners.
That's what it does.  He can go represent soccer players as an
agent, he can go commentate on soccer like he's been doing, he
can do a number of things, he just can't interfere with our
core business, and that's markedly different than some of the
cases that he cites in his brief.

I would note that in terms of irreparable harm, there
was no undue delay in enforcing the restrictive covenant
agreement.  In November of 2021, Relevent heard that Stillitano
was working for an Italian soccer league.  That's not
necessarily competitive activity.  That's why they asked him to

M4ITRELA

1    clarify what he was doing and reminding him of his contractual

2    obligations.  We were not on notice that he was actively trying

3    to compete with us by organizing soccer matches with our

4    partners.  We didn't learn that until the beginning of 2022,

5    and at that time we immediately reached out to Mr. Stillitano's

6    counsel, who told us -- and the submissions are before the

7    Court -- that he was interested in resolution, so we entered

8    into settlement discussions.

9           And as set forth on page 15 of our brief, the *Cortland*

10   *Line* decision, the Court can excuse any delay caused by

11   attempts to resolve the matter without litigation.  That is

12   precisely what we did.  We entered into long, extensive

13   settlement discussions with Mr. Stillitano.  Mr. Stillitano's

14   counsel represented that he would abide by his non-competition

15   agreement.  Then we sent him an agreement that memorialized the

16   terms that the parties had entered into, we heard nothing for a

17   few weeks, I went back.  Then we heard that he was actually

18   competing again through business partners.

19          I reached out again to Mr. Stillitano's counsel, who

20   then said no, you have things wrong.  That is in my letter of

21   April 15.  We attached the communication that we had things

22   wrong, we didn't understand the facts, and we were strung along

23   and led to believe that he was going to comply.  And then what

24   he did was he asked for another $800,000 in his agreement that

25   was never agreed upon.  And as soon as we realized there would

M4ITRELA

1    be no agreement and he was competing, we then sought judicial

2    intervention.  So the notion that Relevent was on notice of

3    this violation for eleven months is just not accurate.  It's

4    not supported by any of the facts in the record.

5          And the notion that Mr. Sillman told Mr. Stillitano

6    that he loved him in December has nothing to do with anything.

7    Mr. Stillitano was like a grandfather to Mr. Sillman and he

8    treated him like that, and he was doing everything that he

9    could to bring Mr. Stillitano in compliance, and we engaged in

10   good faith settlement discussions to try to accomplish that

11   short of litigation.  All the while, Mr. Stillitano was

12   competing behind our backs and lying to us.

13         So if anything, that forms the basis, along with the

14   false submissions that were made by counsel, that we put --

15   that are made clear in my letter of Friday, April 15, that the

16   statements that were made in their brief and Mr. Stillitano's

17   affidavit are just plain false.  And all of these underhanded

18   tactics that Relevent suffered while it tried in good faith to

19   resolve this short of litigation cannot possibly be used

20   against us, but it is markedly different than the *KD* case that

21   Mr. Stillitano cites.

22         In terms of the scope of the non-compete, it is

23   reasonable in length and geography.  Courts routinely uphold

24   non-competes for a year, particularly with key executives with

25   unique skills like Mr. Stillitano.

M4ITRELA

1          The geographic scope is also reasonable.  Relevant's

2     core business is organizing soccer matches between the top

3     European soccer clubs in the world.  These clubs can only play

4     one match at a time, so if they're being organized in Dubai,

5     they can't play in Los Angeles.  That's the whole reason that

6     the scope of the restrictive covenant is global in nature.  And

7     again, it is very narrow.  If the Court looks at the

8     non-compete, it is very narrowly tailored to protect Relevant's

9     legitimate business interests which are protection of its

10    highly confidential proprietary information that we have pled

11    sufficient facts in our verified complaint establishing all of

12    the confidential information that Mr. Stillitano had in his

13    possession.

14          With respect to the balancing of the hardships,

15    Mr. Stillitano, if only barred from competing with us for

16    another few weeks, certainly will not endure undue hardship.

17    But the next few weeks are critical, because as soon as -- if

18    the TRO is lifted, he will actively compete with Relevent and

19    try to host soccer games in the summertime period that would

20    cause irreparable harm and do irreparable damage to Relevent

21    and its business partners using -- its relationship with its

22    business partners using all of the confidential information

23    that he obtained and leveraging all that information to

24    Relevant's detriment.  That is precisely the reason that

25    non-competes are enforced in New York.  It is to protect this

M4ITRELA

1  sort of highly proprietary confidential information and trade

2  secrets from being misappropriated, and that's what Relevent is

3  trying to do here for a limited period of time.

4       In terms of the arbitration, I will note again that

5  these are two separate issues, that Relevent and Mr. Stillitano

6  agreed to adjudicate the scope of the restrictive covenant

7  before a court and separate that issue, and all other issues

8  are adjudicated before an arbitrator.

9       And so once again, if this issue is not addressed by

10 the Court, it's very different than the cases cited by

11 Mr. Stillitano like the *Benihana* case where at issue in those

12 cases are court orders that are enjoining court cases in aid of

13 arbitration.  That is not what is happening here.  That is very

14 different than the relief we are seeking here.  We are seeking

15 affirmative relief from this Court, we are not seeking an order

16 in aid of arbitration.  So all of those cases are markedly

17 different and have nothing to do with the circumstances at

18 issue in before the Court now.

19       THE COURT:  Thank you.  I'm going to give Mr. Hutcher

20 one minute to add anything that he may wish to say in response.

21 If not, I will then close the hearing.

22       MR. HUTCHER:  Just very briefly, your Honor.  First of

23 all, what Mr. Mufson failed to address is the issue of the

24 failure to pay the $650,000 in one year.  Once again, you can't

25 have it both ways.  You can't be relying on the agreement and

M4ITRELA

1   then not living up to the terms.

2           Second, the idea that Mr. Stillitano was using

3   confidential information, there is no basis to that.  He has

4   not taken any documents, he has not used any confidential

5   information.  There is nothing confidential about who plays

6   soccer in the world.  The claim that he has used this

7   information is just rank conclusory allegations.

8           The idea also that there is a separation between the

9   restrictive covenant agreement and the contract is just not

10  realistic.  In order for those issues to be resolved requires a

11  determination of facts, and that is issues that the parties

12  expressly agreed would be determined in the arbitration.

13          Finally, Judge, the scope of this TRO and injunction

14  that was issued is not only against Stillitano, it involves

15  third parties who have nothing whatsoever to do with Relevent

16  who were not party to any agreement.  That they have been

17  enmeshed in this has been extremely detrimental.  These parties

18  have respected the TRO and have not taken any action, but that

19  scope of the TRO is so broad that it is extremely, extremely

20  prejudicial.

21          I'll stop there, your Honor.

22          MR. MUFSON:  Your Honor, may I respond for 30 seconds

23  to that point?

24          THE COURT:  Yes.

25          MR. MUFSON:  So first of all, on the $650,000

M4ITRELA

1   severance, this whole issue is a red herring.  If one looks at

2   the employment agreement, paragraph 11C provides the severance

3   Mr. Stillitano was entitled to.  It uses the defined term "base

4   salary."  There's no dispute that if he was terminated without

5   cause or for good reason and he signed a release within 45 days

6   of his termination of employment that he would receive

7   $625,000.  That is a defined term in the agreement, there's no

8   dispute about that.

9        That has nothing to do with the fact that his salary

10  was reduced to $200,000.  It is completely irrelevant to the

11  notion that his salary was reduced and he ratified the

12  reduction of his salary.  The fact is Relevent was willing to

13  pay him the $625,000 in severance if he signed a release.

14  That's precisely what they're obligated to do.  One has nothing

15  to do with the other.

16       THE COURT:  Mr. Mufson, thank you very much.  I'm

17  closing the hearing at this point.  I think that you made your

18  arguments quite clear and I don't believe anything further is

19  necessary for the Court to issue a ruling, so I am closing the

20  public hearing.

21       I am persuaded that the Court should not lift the TRO

22  and that the Court's preliminary injunctive relief should

23  remain in effect through May 7.

24       I am persuaded that the covenants agreement

25  non-compete and non-solicitation clause is enforceable both as

M4ITRELA

1    to duration and as to geographic scope.  One year is not

2    unreasonable in this type of agreement, in fact it's quite

3    common, and given the nature of the business, worldwide scope

4    in this case is also not unreasonable.

5         The Court is persuaded that Relevent, the plaintiff,

6    is likely to succeed on the merits given that it is undisputed

7    that there was a breach of the non-compete agreement by

8    Mr. Stillitano, and that Relevent has admitted evidence of

9    irreparable harm and case law sustaining irreparable harm in

10   these circumstances where an employee engages in direct open

11   competition with his former employer in violation of a clear

12   non-compete clause.

13        Other considerations involve the type of skills that

14   are involved in this case.  Like other relevant cases, the

15   skills of Mr. Stillitano are unique, his knowledge is extensive

16   in the field, and it is by no means the garden variety type of

17   employment relationship.  Mr. Stillitano did possess trade

18   secrets and proprietary information over many years in his

19   relationship with Relevent.

20        Mr. Hutcher indicates that Mr. Stillitano did not have

21   possession of trade secrets or proprietary information.  That,

22   however, is a conclusory statement which raises an issue of

23   fact, either he did or he did not, and the Court is not in a

24   position at this point, without Mr. Stillitano's sworn

25   statements under oath in depositions, to make a determination

M4ITRELA

1    as to whether or not he possesses secrets and proprietary

2    information.  I think it is not unreasonable for the Court to

3    infer that, given his extensive knowledge of the business and

4    his long relationship with Relevent, that he probably did

5    obtain sufficient trade secret and proprietary information to

6    raise a question as to whether his use of that could sustain a

7    finding of irreparable harm.

8         I believe the balance of hardships and public

9    interests outweigh Mr. Stillitano's burden of the covenant.

10   One of the major public interests here is giving effect to

11   clear provisions of a contractual agreement and clear

12   indication that those provisions were in fact violated by one

13   of the parties.  Under the rules of practice in injunctive

14   relief, the Court can bind third parties to the extent there

15   are third parties who are acting either as agents of a

16   defendant or acting in concert with the party and therefore

17   creating a violation by joint action.

18        For all of these reasons, the Court will issue a

19   ruling, an order sustaining the relief that's now in place and

20   finding the covenants agreement enforceable and in effect

21   through May 7.

22        There's one other question which we did not address,

23   which is the request for expedited relief.  The Court granted

24   that in the TRO and will reaffirm its grant.

25        Finally, there is a question of bond to secure

M4ITRELA

 1    compliance, and there is a request from Mr. Stillitano for a

 2    bond corresponding to the amount that he believes he is owed.

 3    I do not believe that it is necessary at this point for the

 4    Court to adopt that number because in effect it would be

 5    adopting findings that are part of the arbitration proceeding.

 6    I will direct that the plaintiff put up a bond of $25,000 as

 7    sufficient security under these circumstances.

 8              I thank you.  Have a good day.

 9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25